UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

OCT 2 7 2006

JUDGE AMY ST. EVE
United States District Court

UNITED STATES OF AMERICA    )
                            )
            v.              )     No. 05 CR 691
                            )     Judge Amy J. St. Eve
STUART LEVINE               )

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant, STUART LEVINE, and his attorney, JEFFREY STEINBACK, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure, and is governed in part by Rule 11(c)(1)(C), as more fully set forth in Paragraph 22, below.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in the above captioned case.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Plea Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities or agencies except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and defendant, STUART LEVINE, and his attorney, JEFFREY STEINBACK, have agreed upon the following:

1.   Defendant acknowledges that he has been charged in the Superseding Indictment with 15 counts of mail fraud or wire fraud in violation of 18 U.S.C. §§ 1341, 1343, and 1346 (Counts One through 15), one count of attempted extortion in violation of 18 U.S.C. §§ 1951 and 2 (Count Sixteen), six counts of misapplication of funds in violation of 18 U.S.C. § 666 (Counts Seventeen through Twenty-Two), and two counts of money laundering in violation of 18 U.S.C. § 1956 (Counts Twenty-Three and Twenty-Four).

2.   Defendant has read the charges against him contained in the Superseding Indictment in this case and the charges have been fully explained to him by his attorney.

3.   Defendant fully understands the nature and elements of the crimes with which he has been charged.

4.   Defendant will enter a voluntary plea of guilty to Count One and Count Twenty-Three of the Superseding Indictment in this case.

5.   Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Twenty-Three of the Superseding Indictment in this case.  In pleading guilty, Defendant admits the following facts and that those facts establish his guilt

2

beyond a reasonable doubt. The following is not a complete statement of all the details known to Defendant regarding the individuals and events described below. The following facts are set forth solely as a factual basis for this guilty plea:

With respect to Count One, beginning no later than in and about the spring of 2003 and continuing through at least in or about July 2004, in the Northern District of Illinois, Eastern Division, and elsewhere, Defendant, Antoin "Tony" Rezko ("Rezko"), Joseph Cari, Steven Loren, Jacob Kiferbaum, Individual A, and others known and unknown to the Grand Jury, devised and intended to devise, and participated in, a scheme and artifice to defraud the beneficiaries of the Teachers' Retirement System of the State of Illinois ("TRS") and the people of the State of Illinois, of money, property, and the intangible right to defendant's honest services, by means of materially false and fraudulent pretenses, representations, and promises, and material omissions, and in furtherance thereof used the United States mails and other interstate carriers, in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

With respect to Count Twenty-Three, on or about March 4, 2004, at Chicago, in the Northern District of Illinois, Eastern Division, Defendant and Rezko knowingly caused to be conducted a financial transaction affecting interstate commerce, when Individual C gave Individual D a $125,000 check drawn on a JP Morgan Chase Bank

3

account made out to a company controlled by Individual D, which involved the proceeds of specific unlawful activity, namely mail fraud in violation of Title 18, United States Code, Sections 1341 and 1346, knowing that the transaction was designed in whole and in part to conceal the nature, source, ownership, and control of the proceeds of said specified unlawful activity, and that while conducting and attempting to conduct such financial transaction, Defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(I) and 2.

### Defendant's Position At TRS and the Planning Board

Defendant was a member of the TRS Board of Trustees from approximately October 2000 through about July 2004. In that capacity, Defendant owed the beneficiaries of TRS a duty of honest services. Defendant was also a member of the Illinois Health Facilities Planning Board ("Planning Board") from about August 1996 through about June 2004, and was last re-appointed to the Planning Board in about August 2003. In that capacity, Defendant owed the people of the State of Illinois a duty of honest services.

In or about the spring of 2003, when certain State of Illinois officials advocated consolidating TRS, the Illinois State Board of Investment, and the State University Retirement System, into a single pension fund, Individual A approached Rezko and Individual

4

B on behalf of Defendant and Individual A for assistance in defeating this proposal. Defendant and Individual A were against the pension consolidation idea because they wanted to preserve their influence and Defendant's position with TRS. Defendant understood that Rezko and Individual B had significant influence with the State of Illinois administration because of their relationships with senior State of Illinois officials and their roles as important fundraisers. Defendant learned from Individual A that Rezko and Individual B agreed to use their relationships and influence with senior State of Illinois officials to oppose the pension consolidation plan in exchange for the agreement of Defendant and Individual A to use their influence and Defendant's position at TRS to ensure that TRS used investment firms and hired lawyers identified by Rezko and Individual B. Defendant agreed to assist Rezko and Individual B with TRS in exchange for their help defeating the consolidation proposal.

In about August 2003, Defendant was re-appointed to the Planning Board. Prior to that point, Defendant discussed his possible re-appointment with Individual A and, separately, with Individual B. Individual A said he'd get back to Defendant about his request and later called Defendant and said that it would happen. A short time later, Defendant was at a meeting in Rezko's office with Individual B and Individual B said that the board seat Defendant wanted had been taken care of. Defendant understood from

5

these conversations that he would be re-appointed to the Planning Board.

About the time Defendant was re-appointed, Rezko and Defendant discussed Defendant's appointment and Rezko said that he had suggested that Defendant be made the vice-chairman of the Planning Board and that Rezko expected to influence a certain number of votes on the Planning Board. In February 2004, the Planning Board elected Defendant as vice-chairman.

In or about the spring of 2004, Rezko and Defendant agreed that Defendant, whose term on the TRS Board was due to expire in May 2004, needed to be reappointed to the TRS Board and that additional TRS Board members needed to be appointed who would cooperate with Rezko and Defendant. Rezko agreed to use his relationships and influence with high-ranking State of Illinois officials to facilitate these efforts. Rezko subsequently indicated to Defendant that Rezko had arranged for Defendant to be re-appointed to the TRS Board, and Defendant was re-appointed on about May 14, 2004.

**Defendant's Efforts to Obtain Payments From Investment Firms**

**Investment Firm 1**

In about late 2002, Defendant learned from Individual C that Investment Firm 1 was trying to obtain investment funds from TRS. Defendant understood that Individual C would earn a finder's fee

from Investment Firm 1 if TRS invested with that firm, and Defendant agreed to help Investment Firm 1 obtain TRS funds.

In or about the spring of 2003, Individual A indicated to Defendant that Rezko had complained to Individual A that a certain local public official, who Defendant knew had a relationship with and raised money for a certain public official, had been pushing Rezko and Individual B for money, which Defendant understood to mean that the local public official wanted to make money from the State of Illinois because of his assistance to the certain public official. Defendant offered to have Individual C share his finder's fee with the local public official so that Defendant could gain favor with Rezko, and Individual A later indicated that Rezko wanted Individual C to split his finder's fee with the local public official. Defendant then told Individual C that Individual C would have to split his finder's fee from Investment Firm 1 with a local public official.

Rezko subsequently told Defendant that Rezko did not want Individual C to split his finder's fee with the local public official. Rezko said that he would supply Defendant with the name of another individual who would split Individual C's fee.

On or about August 14, 2003, the TRS Board approved an investment of a total of $50 million in two investment funds operated by Investment Firm 1. Defendant intentionally concealed from and failed to disclose to the TRS Board material facts

7

relating to its consideration of the application for funds of Investment Firm 1, including his arrangements with Rezko. Individual C received a total of $375,000 from Investment Firm 1 for acting as a consultant to Investment Firm 1 in connection with TRS. Defendant, Rezko, and Individual C agreed that Individual C would pay $250,000 of that fee as he was directed by Defendant.

Defendant asked Steve Loren, who was outside counsel for TRS and an associate of Defendant's, to prepare a draft contract that would appear to justify Individual C's splitting his finder's fee by paying $250,000 of that fee to a third party, although Defendant knew that the contract would be a sham. Loren drafted a sham consulting agreement for Individual C, in order to conceal the fraudulent nature of the payments by Individual C to a third party, and Defendant arranged to get a copy of the consulting agreement to Individual C.

In or about early 2004, Rezko told Defendant that Individual C should split his finder's fee from Investment Firm 1 with Individual D, who was involved with Rezko in the operation of a chain of pizza restaurants. Defendant relayed this instruction to Individual C, and gave Individual C the sham consulting agreement that Loren had prepared in order to conceal the fraudulent nature of the payments. As Defendant expected, Individual C and Individual D each signed the sham consulting agreement.

8

As Defendant knew, on or about March 4, 2004, acting at Defendant's direction, Individual C gave Individual D a check in the amount of $125,000 payable to Individual D's company as the first installment of the money that Individual D would receive. Defendant knew that the purpose of providing the $125,000 to Individual D was to conceal the nature, source, ownership, and control of the proceeds of the money.

In or about late April 2004, Individual D asked Individual C to pay the remaining $125,000 immediately, instead of waiting for July. At that point, Individual C refused to make the payment early. After learning that Individual C had refused to pay Individual D the $125,000 immediately, Rezko spoke with Defendant. Rezko directed Defendant to arrange for Individual C to make the payment to Individual D.

On or about April 26, 2004, Defendant directed Individual C to make the second $125,000 payment to Individual D immediately, which Individual C agreed to do. Defendant subsequently learned that Individual C gave Individual D a check for $125,000 made payable to Individual D's company that same day.

On or about July 18, 2003, at Chicago, Investment Firm 1 sent and delivered by UPS, a commercial interstate carrier, an envelope from Investment Firm 1 in Chicago, Illinois, and addressed to TRS in Springfield, Illinois, which envelope contained a TRS Questionnaire that had been completed by Investment Firm 1 as part

9

of Investment Firm 1's application for TRS funds. Defendant admits
that this mailing was in furtherance of scheme, for the purpose of
executing the scheme, and attempting to do so and was reasonably
foreseeable to him.

### Investment Firms 2 and 3

In or about late 2003 and early 2004, Defendant agreed with
Individual C that Defendant would use his influence and position at
TRS to help Investment Firms 2 and 3 get investments from TRS.
Individual C agreed that he would split any finder's fees that he
received from Investment Firms 2 and 3 at Defendant's direction.
Investment Firms 2 and 3 each agreed to pay a finder's fee to
Individual C, and each applied for TRS funds.

Defendant directed Loren to assist Individual C by providing
advice about the sorts of investments that TRS would consider and
reviewing investment proposals submitted by Individual C and
others. As Defendant knew, Loren subsequently met with
representatives of Investment Firms 2 and 3 and discussed potential
TRS investments. Defendant arranged for TRS staff members to meet
with representatives of Investment Firms 2 and 3 and indicated to
TRS staff that Rezko and Defendant wanted TRS staff to recommend
that the TRS Board approve investments in Investment Firms 2 and 3.

On or about April 12, 2004, Defendant directed Individual C to
share his potential finder's fees from Investment Firms 2 and 3
with Individual E, who was a friend and business associate of

10

Defendant. Defendant knew that Individual E would provide no services to Individual C or Investment Firms 2 or 3 in connection with their applications to receive TRS funds. Defendant arranged with Individual E that Defendant would later receive a portion of the payments Individual E received from Individual C.

On or about April 14, 2004, Rezko and Defendant agreed that they would each receive approximately one-third of the finder's fees that they expected Individual C to receive for TRS investments in Investment Firms 2 and 3. At that time, Rezko and Defendant expected that Individual C would receive approximately $250,000 from Investment Firm 2 and $1 million from Investment Firm 3.

TRS staff initially recommended that the TRS Board approve a $25 million investment with Investment Firm 2 and the TRS Board was scheduled to vote on that recommendation at the May 2004 TRS Board meeting. Shortly before the May 2004 TRS Board meeting, TRS staff learned that Investment Firm 2 had not initially disclosed that Individual C would receive a finder's fee as required by a TRS questionnaire. After learning that the TRS staff was concerned about Investment Firm 2's failure to disclose the finder's fee for Individual C, Defendant tried to help Investment Firm 2 remain on the TRS agenda. On or about May 20, 2004, Defendant was approached by law enforcement agents. As a result of that approach, Defendant stopped trying to help Investment Firm 2 remain on the TRS agenda. Defendant intentionally concealed from and failed to disclose to

the TRS Board material facts relating to its consideration of the application for funds of Investment Firm 2, including his arrangements with Rezko.

TRS staff had not completed its review of Investment Firm 3's application when Defendant was approached by law enforcement agents on or about May 20, 2004. After that date, Defendant did not further attempt to assist Investment Firm 3's application. Investment Firm 3's application was never presented to the TRS Board. Defendant intentionally concealed from and failed to disclose to the TRS Board material facts relating to its consideration of the application for funds of Investment Firm 3, including his arrangements with Rezko.

### Investment Firm 4

In or about late February or early March 2004, after Investment Firm 4 had made a presentation to TRS staff members seeking funds from TRS, Defendant spoke with Joseph Cari about Investment Firm 4's application. Defendant and Cari agreed that Defendant would help Investment Firm 4 get funds from TRS and that Investment Firm 4 would hire a consultant chosen by Defendant.

On or about April 14, 2004, Rezko and Defendant discussed Investment Firm 4's application for TRS funds. Defendant told Rezko that Investment Firm 4 had agreed to hire a consultant chosen by Defendant in exchange for Defendant's help. Rezko told Defendant that he would provide Defendant with the name of a person

12

who would receive the consulting fee on behalf of Rezko and Defendant. Rezko and Defendant agreed that they would share evenly the finder's fees that Investment Firm 4 paid to the consultant they chose. At that time, Rezko and Defendant expected that Investment Firm 4 would pay the consultant they chose approximately $750,000.

In that same conversation, Rezko and Defendant discussed an application by Cari's private equity firm for ISBI funds. Defendant had arranged with Cari that Cari's private equity firm would pay a 2% finder's fee to a person identified by Defendant. Rezko and Defendant agreed that they would share evenly the finder's fees that Cari's private equity firm paid, which they expected would be approximately $700,000.

In or about late April 2004, Rezko provided Defendant with the name of Individual F as the person who would receive the consulting fee from Investment Firm 4. Defendant spoke with Individual F and confirmed that Individual F would receive a finder's fee from Investment Firm 4, although Individual F would not be expected to do any actual work for Investment Firm 4. Defendant and Individual F agreed that Individual F would send a portion of the finder's fee he received from Investment Firm 4 to a company controlled by Individual E.

In or about late April 2004, Defendant directed Loren to prepare a draft contract for Investment Firm 4. Defendant told

13

Loren that there was going to be a split of finder's fees relating to the TRS investment in Investment Firm 4. Loren prepared a draft compensation agreement, which Defendant sent to Individual F.

On or about May 1, 2004, Defendant discussed with Individual E the possibility of changing the agreement between Rezko and Defendant so that Rezko would keep the entire $750,000 fee from Investment Firm 4 while Defendant and Individual E would keep the entire $700,000 fee that Defendant expected from Cari's private equity firm.

Defendant directed Cari to make sure that Investment Firm 4 hired Individual F as a consultant, and knew that Cari in turn put pressure on Investment Firm 4 to hire Individual F, such as by threatening Investment Firm 4 that it would not get TRS money if it did not hire a consultant.

After Defendant was approached by law enforcement agents on or about May 20, 2004, he did not try to interfere with Investment Firm 4 or its application for TRS funds. Investment Firm 4 received approval for an approximately $85 million investment at the May 25, 2004 TRS Board meeting. Defendant intentionally concealed from and failed to disclose to the TRS Board material facts relating to its consideration of the application for funds of Investment Firm 4, including his arrangements with Rezko.

### Investment Firm 5

In about 2003, Rezko told Defendant that Individual G, who

14

worked with Rezko's real estate business, would act as a finder on Rezko's behalf. Defendant agreed with Rezko to use Defendant's influence and position at TRS on behalf investment firms that Individual G brought to TRS, including Investment Firm 5. Defendant used his influence with the TRS staff to ensure that Individual G and representatives of Investment Firm 5 met with key members of the TRS staff, as well as with Loren. Defendant encouraged TRS staff to recommend that TRS place funds with Investment Firm 5.

TRS staff indicated to Defendant and others that the TRS staff would recommend that Investment Firm 5 receive a $25 million investment from TRS at the May 2004 TRS Board meeting. On or about May 20, 2004, a TRS staff member expressed concern to Defendant that Investment Firm 5 had disclosed that Individual H, with whom TRS staff members had not had contact, would be the recipient of a finder's fee. In response, Defendant tried to allay the TRS staff member's concerns in order to help Investment Firm 5.

After Defendant was approached by law enforcement agents later that day, Defendant no longer tried to help Investment Firm 5. Investment Firm 5's application for TRS investment funds was not addressed at the May 2004 TRS Board meeting. Defendant intentionally concealed from and failed to disclose to the TRS Board material facts relating to its consideration of the

15

application for funds of Investment Firm 5, including his arrangements with Rezko.

### Investment Firm 6

In about early 2004 Defendant learned from Individual I and others that Investment Firm 6 was interested in attracting investments from Illinois state pension funds, including TRS. Defendant agreed with Individual I that Defendant and Rezko would use Defendant's position at TRS and their influence at TRS and other state pension funds to help Investment Firm 6 obtain investments. Individual I agreed that he would split any finder's fees he received from Investment Firm 6 with Defendant in exchange for Defendant's assistance. Individual I further agreed to split with Defendant the ongoing management fees that Investment Firm 6 would earn from investments from TRS. Individual I agreed to pay Defendant two-thirds of the finder's fees and management fees that Individual I received so that Defendant could share those fees with Rezko.

On or about April 14, 2004, Defendant advised Rezko about Defendant's arrangement with Individual I. Rezko and Defendant agreed that they would share evenly the fees that Individual I would receive for TRS and other Illinois state pension fund investments in Investment Firm 6. Rezko also agreed to use his influence with other Illinois state pension funds to help Investment Firm 6 obtain investments from those entities. Rezko

16

and Defendant each expected to receive at least approximately $1.3 million in fees from Individual I, based on the size of the investment that Rezko and Defendant believed TRS would make in Investment Firm 6.

To assist Investment Firm 6, Defendant arranged for a meeting with Defendant, Loren, Individual I, and representatives of Investment Firm 6 so that the Investment Firm 6 representatives could explain their firm and investment products to Loren. At Defendant's request, Loren provided Investment Firm 6 with advice about how Investment Firm 6 should proceed with an application for funds from TRS.

On or about May 19, 2004, Defendant told Individual I that he intended to recommend Investment Firm 6 to TRS staff after the May 2004 TRS Board meeting.

At the time that Defendant was approached by law enforcement agents on or about May 20, 2004, Investment Firm 6 had not yet applied for TRS funds. Defendant did not attempt to help Investment Firm 6 obtain TRS funds after that date. Defendant intentionally concealed from and failed to disclose to the TRS Board material facts relating to the potential application for funds by Investment Firm 6, including his arrangements with Rezko.

### Investment Firm 7

In about early 2004, Defendant learned that TRS staff had decided to recommend that the TRS Board allocate available funds

17

for real estate investments among the existing TRS real estate managers, which included Investment Firm 7, and that TRS staff were going to recommend that TRS invest $220 million with Investment Firm 7 at the February 2004 TRS Board meeting.

Defendant arranged to postpone the planned TRS allocation to Investment Firm 7 in order to force Investment Firm 7 or Individual J, a principal with Investment Firm 7, to pay a fee to Defendant for his support for the potential allocation. Defendant provided information to TRS staff about a possible sale of Investment Firm 7, which resulted in TRS staff recommending at the February 2004 TRS Board meeting that the TRS Board postpone the planned allocation to Investment Firm 7. The TRS Board, including Defendant, agreed that TRS would not allocate $220 million to Investment Firm 7 pending further investigation.

In or about April 2004, Rezko and Defendant agreed to use their influence and Defendant's position at TRS to prevent Investment Firm 7 from getting its $220 million allocation unless Individual J agreed either to pay an approximately $2 million fee to a consultant chosen by Rezko and Defendant, or to arrange for approximately $1.5 million in political contributions to be made to a certain public official. Rezko and Defendant agreed that they would split the fee paid to the consultant if that was what Individual J chose to do. Rezko and Defendant further agreed that Defendant would arrange for an intermediary, namely Individual A,

18

to indicate to Individual J that Investment Firm 7 had not received its $220 million allocation because Investment Firm 7 had not contributed significantly to a certain public official.

In about early May 2004, Defendant directed Individual A to tell Individual J that there had been a meeting involving Rezko and Individual B concerning plans for raising political donations from pension fund managers, and that during this meeting Rezko had observed that Investment Firm 7 had a lot of TRS funds under management but had not made any political donations. Subsequently, Defendant learned from Individual A that Individual A told Individual J words to the effect that Investment Firm 7 had not gotten its $220 million allocation from TRS because of its failure to make political donations.

On or about May 8, 2004, Individual J advised Individual A that he would not be extorted. Individual A advised Defendant of this conversation and told Defendant that Individual J had threatened to inform law enforcement about what Rezko and Individual B were doing. Individual A and Defendant agreed to discuss the matter with Rezko.

On or about May 10, 2004, Rezko, Defendant, Individual A, and Individual B agreed that in light of Individual J's reaction, it was too risky to continue demanding money from Investment Firm 7 or blocking its $220 million allocation. They further agreed that although Investment Firm 7 would receive the $220 million

19

allocation, it would not receive any further business from any State of Illinois entity, including TRS.

On about May 25, 2004, the TRS Board, including Defendant, voted to invest a total of $220 million with Investment Firm 7. Defendant intentionally concealed from and failed to disclose to the TRS Board material facts relating to its consideration of the application for funds of Investment Firm 7, including his arrangements with Rezko, Individual A, and Individual B.

### TRS Asset Manager

In or about the Spring of 2004, Rezko, Individual E, and Defendant agreed to establish or obtain a company that they or their nominees would own and control. Rezko, Individual E, and Defendant further agreed that they would use their influence and Defendant's position at TRS to ensure that TRS would make hundreds of millions of dollars of real estate investments with their company. Defendant, Rezko and Individual E expected to share the profits from the company. Defendant intentionally concealed from and failed to disclose to the TRS Board material facts relating to his plan to establish a real estate asset management company, including his arrangements with Rezko and Individual E.

### Mercy Health System Corporation's Application for a CON

In late 2003, Defendant and Kiferbaum agreed that Defendant would use his position as a Planning Board member to influence the Planning Board to approve the application of Mercy Health System

Corporation ("Mercy") for a Certificate of Need ("CON") so that Kiferbaum's construction company could build its new hospital in Crystal Lake, Illinois. In exchange for Defendant's help, Defendant and Kiferbaum agreed that Kiferbaum would pay a kickback as directed by Defendant, with the exact amount and manner of the payments to be determined at a later date.

After agreeing with Kiferbaum about the kickback, Defendant met with Rezko and told Rezko that Kiferbaum was willing to pay a kickback to ensure that Mercy's application would be approved. Rezko then agreed to use his influence with the Planning Board to support Mercy's application in exchange for a share of that kickback. Defendant and Rezko agreed they would evenly divide the kickback from Kiferbaum, which they expected would be approximately $1 million or more.

At its meeting on December 17, 2003, the Planning Board issued an intent-to-deny with respect to Mercy's CON application. Defendant voted to deny Mercy's application with the expectation that Mercy would respond to the intent-to-deny and the Planning Board would approve Mercy's application at a subsequent meeting with Rezko's support from behind the scene.

Shortly before the Planning Board meeting on April 21, 2004, Defendant had several telephone conversations with another Planning Board member about Mercy and its application for a CON. That Planning Board member said he had his "marching orders" from Rezko and that Rezko wanted to help on Mercy's application. In another

21

telephone conversation with the same Planning Board member, Defendant said that it was important that Rezko's direction on the vote be communicated to the other Planning Board members that Rezko influenced on the Planning Board.

At its meeting on April 21, 2004, the Planning Board considered Mercy's application for a CON. At this meeting, Defendant and a majority of the Planning Board voted in favor of Mercy's application. Defendant intentionally concealed from and failed to disclose to the Planning Board material facts relating to its consideration of Mercy's application, including his arrangements with Rezko and Kiferbaum. After the meeting concluded, another Planning Board member and Defendant met with Rezko and discussed the Mercy vote.

After the April 21, 2004, Planning Board meeting, Defendant directed Kiferbaum to pay the kickback relating to Mercy to Individual E pursuant to a sham consulting contract. Steve Loren drafted the contract. Defendant, Kiferbaum, and Individual E agreed that the purpose of the contract was to make Kiferbaum's payments to Individual E look legitimate; that Individual E would not, in fact, to do any work for Kiferbaum; and that Individual E would share the Mercy kickback with Defendant.

Defendant and Kiferbaum also discussed the fact that Kiferbaum was paying money at Defendant's direction to John Glennon in connection with another contract and the fact that Kiferbaum still owed Glennon $200,000 to $300,000 on that an earlier contract.

Defendant told Kiferbaum to stop paying Glennon and said that the money remaining to be paid to Glennon would be rolled into the dollar amount of the kickback to be paid on Mercy.

6. Defendant also acknowledges that for the purpose of computing his sentence under the U.S. Sentencing Guidelines, the following conduct, to which he stipulates, constitutes other instances of fraudulent conduct, and admits that these facts constitute relevant conduct under Section 1B1.3 of the Guidelines beyond a reasonable doubt. The following is not a complete statement of all the details known to Defendant regarding the individuals and events described below.

### Investment Firm 7 (2001)

In about late 2001, Defendant learned that Investment Firm 7 was seeking an approximately $100 million investment from TRS. Defendant spoke with Individual J about that potential allocation. Defendant wanted Individual J to pay Defendant and Individual E $500,000 plus a portion of the fees that Investment Firm 7 would earn on an annual basis from TRS if Investment Firm 7 received the allocation in exchange for Defendant's help ensuring that TRS approved the $100 million allocation. Defendant understood that Individual J had agreed to Defendant's demand, and voted in favor of the allocation without disclosing his interest in the matter to the TRS Board in December 2001, when the $100 million investment was approved. After the allocation was approved, however,

Individual J, refused to pay Defendant the $500,000 that Defendant believed was owed to him.

Defendant intentionally concealed from and failed to disclose to the TRS Board material facts relating to its consideration of the application for funds of Investment Firm 7 in 2001, including his discussions with Individual J.

### Investment Firm 8

In about early 2002, Defendant learned that Investment Firm 8 wanted to obtain an investment from TRS. Individual K, who Defendant understood was going to receive a finder's fee from Investment Firm 8 if it received a TRS investment, asked Defendant to help Investment Firm 8 obtain an investment from TRS. Defendant agreed to help and subsequently attempted to assist Investment Firm 8 to receive investment funds from TRS. Individual A subsequently indicated to Defendant that because he had helped Individual K, Defendant could stop paying fees to Individual K for lobbying the state of Illinois on behalf of a client of Defendant's. Investment Firm 8 received an investment of approximately $150 million from TRS in about August 2002. Defendant intentionally concealed from and failed to disclose to the TRS Board material facts relating to its consideration of the application for funds of Investment Firm 8, including his arrangements with Individual A and Individual K.

### Investment Firm 9

In about 2003, Defendant learned from Individual C that Investment Firm 9 was looking for investors for an investment into

24

senior living facilities. Defendant agreed to help Investment Firm 9 and expected to receive a kickback if he could arrange for TRS money to be invested with Investment Firm 9.

Defendant encouraged Individual A to arrange for his real estate asset management firm, which invested hundreds of millions of dollars in TRS funds, to invest in Investment Firm 9. Defendant explained to Individual A that Defendant and Individual E would make money if Individual A's firm invested in Investment Firm 9. Individual A agreed to investigate Investment Firm 9 to determine if he wanted his firm to make an investment.

Defendant, Loren, Individual A, and another individual met in about early 2004 to discuss the amount of money that Individual A's firm would receive in TRS funds at the February 2004 TRS Board meeting. At that meeting, Individual A indicated that he wanted his real estate asset management firm to receive a larger allocation of money from TRS if his firm was going to invest money with Investment Firm 9. It was agreed that TRS would increase the amount of money allocate a larger amount of money to Individual A's firm to cover any investment that Individual A's firm made with Investment Firm 9, which investment Defendant expected would be in the tens of millions of dollars.

Individual A's firm received a total allocation of $220 million from TRS at the February 2004 TRS Board meeting. Defendant intentionally concealed from and failed to disclose to the TRS Board material facts relating to its consideration of the

allocation for funds of Investment Firm 9, including his arrangements with Individuals A and E.

Individual A's firm did not invest any money in Investment Firm 9, so Defendant did not receive any kickback.

### Edward Hospital's Application for a CON

Beginning in late 2003, Defendant, Kiferbaum, and P. Nicholas Hurtgen ("Hurtgen") agreed that Defendant would use his position as a Planning Board member to attempt to force Edward Hospital ("Edward") to hire Kiferbaum's construction company to build Edward's Plainfield, Illinois hospital and medical office building by threatening representatives of Edward that the Planning Board would not approve Edward's application for the hospital facility unless Kiferbaum's construction company was given the construction contracts to build them The total costs of constructing the hospital were projected to be approximately $90 million, and the total costs of constructing the medical office building were projected to be approximately $23 million. In exchange for Defendant's assistance, Defendant and Kiferbaum agreed that Kiferbaum would pay an Edward related kickback to Defendant or Defendant's designee. Hurtgen assisted with the Edward scheme because he wanted his employer, Bear Stearns & Co. ("Bear Stearns"), to receive the financing work for the new hospital.

Shortly before the Planning Board meeting on December 17, 2003, Hurtgen told Defendant that his client, Edward, had a CON application before the Planning Board, and Hurtgen asked Defendant

26

to find out how the application was going. Defendant made inquiry and then told Hurtgen that Edward would get an intent-to-deny for the medical office building at the December meeting if it did not agree to defer that application so that its medical office building application and its hospital application could be heard at the same time.

At the Planning Board meeting on December 17, 2003, Edward did not request to defer the medical office building application, and the Planning Board issued an intent-to-deny with respect to that application. Soon thereafter, Hurtgen asked Defendant if it would make a difference for Edward if Edward hired Kiferbaum's construction company to build the hospital. Defendant said it might and asked Hurtgen to introduce Kiferbaum to the CEO of Edward. Hurtgen agreed to make that introduction.

No later than early 2004, Kiferbaum and Hurtgen knew that Defendant was prohibited by law from engaging in *ex parte* communications with applicants with matters pending before the Planning Board, and each knew that Defendant could not communicate with representatives from Edward about their pending applications. Therefore, in order to protect Defendant and conceal his role, Kiferbaum and Hurtgen communicated with Edward representatives, in place of and on behalf of Defendant, in order to communicate Defendant's threats and promises to Edward.

On or about December 22, 2003, Hurtgen talked to the Edward CEO and said, among other matters, that if Edward hired Kiferbaum,

27

Hurtgen thought Edward would not have any further difficulties with the Planning Board. Hurtgen also said he was selling "clout," and that Defendant is the "clout." The following day, on or about December 23, 2003, Kiferbaum and Hurtgen met with the Edward CEO to persuade the Edward CEO to hire Kiferbaum's construction company to build the two pending projects. Kiferbaum told the CEO that he had been working with Mercy on its new project, and that its application to build a new hospital in Crystal Lake was going to be approved.

In response to representations by Kiferbaum and Hurtgen that they were working with Defendant, and that Defendant had the ability to, and would, cause the Planning Board to approve or deny Edward's application - depending on whether or not Edward Hospital hired Kiferbaum - the Edward CEO requested that Kiferbaum and Hurtgen demonstrate that they were telling the truth about Defendant's role by setting up a meeting with Defendant, which Kiferbaum and Hurtgen agreed to do.

On or about April 17, 2004, Defendant told Kiferbaum that he would speak to Kiferbaum and the Edward CEO at a restaurant on April 18, and he would have Hurtgen or someone else with him. On or about April 17, 2004, Hurtgen and Defendant agreed that Hurtgen would join Defendant at the breakfast the next day.

On or about April 18, 2004, Defendant and Kiferbaum talked about the meeting that they were going to have that morning at a restaurant. Defendant said he would talk to Kiferbaum and the

Edward CEO at the restaurant. Defendant instructed Kiferbaum to tell the Edward CEO that because of the ethics law concerning *ex parte* communications relating to pending projects, the CEO should not ask anything direct about her particular project. Defendant said that the CEO knew why she was there with Kiferbaum, and she was either going to do it or she was not going to do it. Defendant said he would bump into Kiferbaum "by mistake" a little later that day.

On or about Sunday, April 18, 2004, Defendant and Hurtgen went to a restaurant in Deerfield, Illinois, as planned, in order to prove to the CEO that Defendant, Hurtgen, and Kiferbaum were working together, and to prove that their representations concerning Defendant and the Planning Board were real. Defendant and Hurtgen walked over to the table where Kiferbaum and the CEO were sitting. Defendant said that he was the Chairman of the Board of CMS, and that Kiferbaum had done a project for them. Defendant said that Kiferbaum is a person upon whom one can rely, and he is a person whose word can be depended on.

Shortly after that meeting, Kiferbaum thanked Defendant for what he had done at the restaurant. Kiferbaum said that it went perfectly and the CEO understood. Kiferbaum said that he told the CEO that they had to come to some sort of agreement. Defendant said that he had never been in a better position. Defendant said that if the CEO promised to sign a contract, Kiferbaum should say that he accepted her word, and that he would do whatever he could.

29

On or about April 20, 2004, the Edward Project Administrator faxed Kiferbaum a letter stating that Edward would not hire Kiferbaum Construction Company for their project. When Kiferbaum received the letter of rejection from Edward, he called Defendant and told him about the letter. Defendant indicated that Edward's application would not be approved.

On or about April 21, 2004, the Planning Board held a Board meeting at which Edward's application for a permit to build the Plainfield hospital was considered. Edward had not hired Kiferbaum, and Defendant voted against Edward's application to build a new hospital, and the Planning Board issued a notice of its intent-to-deny the application.

Defendant acknowledges that a reasonable estimate of the net value of the benefit that would have been received by the contractor that would have built the new hospital and medical building for Edward was approximately $1,810,000.

7. For the purpose of calculating his sentence under the Sentencing Guidelines, Defendant also admits to the following facts and that these facts constitute a criminal offense and prove it beyond a reasonable doubt, and pursuant to Section 1B1.2 of the Guidelines, defendant stipulates to having committed the following criminal offense. The following is not a complete statement of all the details known to Defendant regarding the individuals or the events described below.

30

## Chicago Medical School and Northshore Supporting Organization

Beginning no later than in or about early 2001 and continuing through at least in or about June 2004, in the Northern District of Illinois, Eastern Division, and elsewhere, Defendant and others devised and intended to devise, and participated in, a scheme and artifice to defraud the Finch University of Health Sciences/Chicago Medical School, now known as the Rosalind Franklin University of Medicine and Science ("Chicago Medical School" or "CMS"), a not-for-profit private education institution located in North Chicago, Illinois, and the Northshore Supporting Organization ("NSO"), a charitable trust established to support and operate for the benefit of CMS, of money, property, and the intangible right to the honest services of Defendant and Kiferbaum by means of materially false and fraudulent pretenses, representations, and promises, and material omissions, and in furtherance thereof used and caused the use of the United States mails and other interstate carriers, and interstate and foreign wires.

It was part of the scheme that Defendant, with the assistance of Kiferbaum, Individual E, and others, fraudulently obtained and sought to obtain millions of dollars for the benefit of Defendant and his nominees and associates which conduct involved a series of kickbacks related to construction contracts and a real estate contract, as well as the diversion of assets from CMS and NSO. In carrying out this scheme, Defendant misused the positions of trust that he held with CMS and NSO and defrauded these institutions of

31

their rights to his honest services. Defendant's fraudulent transactions in the course of the scheme included a kickback and deceit relating to the construction of an addition to the Chicago Medical School; a kickback and deceit relating to the construction of student housing at CMS; a kickback and deceit relating to CMS's sale of real property at 1101 N. Dearborn St., Chicago; and deceit in connection with the diversion of assets from CMS and NSO, the charitable trust established to support CMS.

More specifically, Defendant admits as follows:

### The CMS Addition

Defendant and Kiferbaum were each members of the CMS Board of Trustees ("CMS Board") and in that capacity they each owed a fiduciary duty and a duty of honest services to the Chicago Medical School.

In or about the summer of 2001, CMS was considering the construction of an addition to the Chicago Medical School. Defendant and Kiferbaum talked about this project and Kiferbaum determined to submit a proposed contract for the project on behalf of his construction company. Defendant told Kiferbaum to include within the costs of his proposed contract an extra $1 million for Defendant. Defendant had sufficient power on the CMS Board to determine whether Kiferbaum received the CMS addition construction contract and Kiferbaum knew that Defendant had that power. If Kiferbaum refused to pay this kickback, Defendant would prevent Kiferbaum from getting this contract. Kiferbaum agreed to pay this

32

kickback of $1 million and did in fact pay approximately $700,000 of that kickback as directed by Defendant.

The CMS Board voted to award the construction contract for the CMS addition to Kiferbaum's construction company. In connection with the CMS Board's consideration of the construction contract, Defendant and Kiferbaum concealed from the CMS Board that they had agreed to Kiferbaum paying a $1 million kickback to Defendant using CMS funds, and that Defendant – who participated in the CMS Board's consideration of the contract – had a substantial personal financial interest in its approval.

Thereafter, Defendant and Kiferbaum caused CMS to pay an extra $1 million in connection with the construction of the CMS addition by Kiferbaum inflating the total cost of the contract, resulting in a contract of approximately $18 million.

In order to conceal the fraudulent nature of the extra $1 million paid by CMS to Kiferbaum's construction company, Defendant directed Kiferbaum to pay the extra $1 million to North Amercian Capital Opportunities, LLC ("NACO"), the consulting company belonging to Defendant's business associate, John Glennon, and Kiferbaum agreed to do so. Defendant understood that Glennon was not then required to pay any of the $1 million to Defendant but Defendant understood that Defendant, Glennon, and Individual E contemplated future business endeavors together. In order to conceal the fraudulent nature of the payments to Glennon, Defendant caused a sham marketing contract to be prepared, which was signed

33

by Kiferbaum and Glennon in or about early December 2001. This contract provided that Kiferbaum's construction company would pay Glennon's company $28,000 a month for approximately three years, for a total of approximately $1 million. Defendant and Kiferbaum did not disclose the contract to CMS.

Beginning in or about December 2001 and continuing on a monthly basis through in or about June 2004, Glennon sent to Kiferbaum an invoice requesting payment of $28,000 each month, despite the fact that Glennon and his company did not provide any substantial services to Kiferbaum's company in exchange for those payments. Over time, Kiferbaum caused his company to pay Glennon's company a total of approximately $700,000.

In or about December 2003 or January 2004, Defendant and Kiferbaum agreed that the balance that Kiferbaum still owed on the kickback relating to the CMS addition would be combined with the kickback payment that Kiferbaum would make relating to Mercy Hospital. Based on that agreement, Kiferbaum stopped paying Glennon's company in approximately January 2004. Neither Glennon nor his company sued for the balance of the contract, an amount in the range of $200,000 to $300,000.

As described above, in paragraph 5, in or about April 29, 2004, Defendant and Individual E caused a sham consulting contract to be drafted and sent to Kiferbaum, providing that Kiferbaum's construction company would pay approximately $1,728,000 million to Individual E's company. Defendant arranged for that contract to

34

include the payment of the kickback relating to Mercy and, additionally, to include the balance of the kickback owed to Defendant in connection with the construction of the CMS addition.

Notwithstanding their positions as members of the CMS Board, Defendant and Kiferbaum intentionally concealed from and failed to disclose to CMS material facts relating to the financial arrangements for the construction of the CMS addition, including, specifically, the nature or purpose of the additional costs to CMS, their agreements and actions concerning the $1 million kickback described above, and the sham marketing and consulting contracts to conceal the fraudulent nature of the diversion, and the planned diversion, of CMS funds to Glennon and Individual E.

### CMS Student Housing

In or about the summer of 2002, CMS was considering the construction of new student housing. Defendant and Kiferbaum talked about this project and Kiferbaum determined to submit a proposed contract for the project on behalf of his construction company. Defendant again told Kiferbaum to include within the costs of his proposed contract an extra $1 million for Defendant. Defendant had sufficient power on the CMS Board to determine whether Kiferbaum received the CMS student housing construction contract and Kiferbaum knew that Defendant had that power. If Kiferbaum refused to pay this kickback, Defendant would prevent Kiferbaum from getting this contract. Kiferbaum agreed to pay this

35

kickback of $1 million and did in fact pay $1 million as directed by Defendant.

The CMS Board voted to award the construction contract for the student housing to Kiferbaum's construction company. In connection with the CMS Board's consideration of the student housing contract, Defendant and Kiferbaum concealed from the CMS Board that they had agreed to Kiferbaum paying a $1 million kickback to Defendant using CMS funds, and that Defendant – who participated in the CMS Board's consideration of the contract – had a substantial personal financial interest in its approval.

Thereafter, Defendant and Kiferbaum caused CMS to pay an extra $1 million in connection with the construction of the CMS student housing by Kiferbaum inflating the total cost of the contract, resulting in a contract of approximately $22 million.

In order to conceal the fraudulent nature of the extra $1 million paid by CMS to Kiferbaum's construction company, in or about December 2002, Defendant directed Kiferbaum to pay this extra $1 million to Individual L, an associate of Defendant's, and Kiferbaum agreed to do. Based on Defendant's direction, on or about December 12, 2002, Kiferbaum caused his company to issue a check in the amount of $628,000, made payable to Individual L. About three months later, on or about March 13, 2003, and again at Defendant's direction, Kiferbaum caused his company to issue a check in the amount of $372,000, also made payable to Individual L. Further, in an effort to conceal the fraudulent nature of the

payments made to Individual L, in or about March 2003, some months after the first check had been issued, Defendant caused a sham marketing contract to be prepared and sent to Kiferbaum. Although the contract stated that Individual L would provide services to Kiferbaum's construction company, Individual L did not provide any such services and Defendant understood that none would be provided.

Notwithstanding their positions as members of the CMS Board, Defendant and Kiferbaum intentionally concealed from and failed to disclose to CMS material facts relating to the financial arrangements for the construction of the CMS student housing, including, specifically, the nature or the purpose of the additional costs to CMS, their agreements and actions concerning the $1 million kickback described above, and the use of a sham marketing contract to conceal the fraudulent nature of the diversion of CMS funds to Individual L.

### The Scholl Property

In connection with CMS's sale of real property at 1101 N. Dearborn Street, Chicago, the long time location of the Dr. William M. Scholl School of Podiatric Medicine ("the Scholl Property"), in or about late 2002, Defendant solicited a sales transaction which would include a kickback of money to Defendant. Defendant agreed to support the sale of the Scholl Property to a certain buyer in exchange for a portion of a third party's finder fee, a portion subsequently estimated to be approximately $1.5 million. Defendant did support that buyer's bid for the Scholl Property and,

notwithstanding his position as a member of the CMS Board, Defendant intentionally concealed from and failed to disclose to CMS material facts relating to the financial arrangements concerning the sale, including, specifically, his agreement and actions concerning the approximately $1.5 kickback described above. Because of the federal investigation and the incomplete nature of the underlying transaction, Defendant was never paid the approximately $1.5 million.

### Northshore Supporting Organization ("NSO")

Defendant also fraudulently diverted a total of $6 million NSO, a charitable trust established to support CMS and for which Defendant served as a trustee, by causing NSO to lend $3 million to a company controlled by Defendant and $3 million to a company controlled by Individual E, and by subsequently arranging to have both of those loans "gifted" without repayment, as set forth below.

In or about the spring and summer of 2001, Defendant and Individual E caused NSO to be created with the purpose of supporting CMS. On or about July 19, 2002, Defendant fraudulently caused NSO to lend $3 million to Defendant's company, S.L. Investment Enterprises, L.P., and $3 million to a company controlled by Individual E. In connection with those loans, notes were executed on behalf of the companies requiring each company to repay the $3 million loan to NSO at the end of 20 years, with an

interest rate of 7.5% per annum, resulting in each company owing approximately $12.5 million in 20 years.

On or about December 1, 2002, Defendant and Individual E each signed a promissory note agreeing to substitute as the borrower of the funds borrowed from NSO by their respective companies. Defendant then used his position as an NSO trustee to cause NSO to donate those two promissory notes to CMS but only on the condition that CMS immediately sell the promissory notes to Individual L for $1 million, the same amount of the kickback that Defendant and Kiferbaum had fraudulently obtained from CMS in connection with the construction of the student housing and diverted to Individual L.

To accomplish this fraudulent transaction, Defendant initially agreed to act as an escrow holder for the notes pursuant to an escrow agreement that required that the notes be maintained in a sealed envelope, thereby concealing from CMS the amounts of the notes and the fact that Defendant and Individual E were the obligors on the notes. On or about January 9, 2003, Defendant arranged to have the Chairman of the CMS Board sign two documents, one accepting the promissory notes as a donation and the other agreeing to sell the promissory notes to Individual L for $1 million, and Defendant never revealed to the Chairman the amounts of the notes of that Defendant and Individual E were the obligors.

On or about January 31, 2003, Defendant and Individual L caused a check for $1 million, drawn on an account belonging to Individual L, to be sent to Defendant. On or about February 3,

2003, Defendant presented the check for $1 million to the President/CEO of CMS. In order to conceal the fraudulent nature of this transaction, Defendant falsely represented to the President/CEO that the $1 million was a personal donation from Defendant and Individual E. Defendant failed to disclose to the President/CEO any information concerning the $6 million promissory notes, including the fact that Defendant had previously arranged with the Chairman of the CMS Board that the $1 million from Individual L would constitute Individual L's payment for the purchase of the NSO promissory notes.

After purchasing the promissory notes for $1 million, Individual L transferred the promissory notes to Defendant and Individual E, respectively, as "gifts," thereby freeing Defendant and Individual E from any obligation to repay the $3 million each had purported to borrow from NSO. By means of this sequence of transactions, Defendant fraudulently obtained and converted $3 million to his personal use, and $3 million to the use of his longtime associate, Individual E.

Notwithstanding his position as a member of the CMS Board of Trustees, Defendant intentionally concealed from and failed to disclose to CMS material facts relating to the series of transactions involving NSO and Individual L, including Defendant's role in these transactions, the personal financial interests of Defendant and Individual E in these transactions, Kiferbaum's earlier payments to Individual L, and that the promissory notes

sold by CMS for $1 million had a total face value substantially in excess of that amount.

In order to conceal the fraudulent nature of this transaction, on or about December 22, 2003, Defendant caused a tax return to be filed with the IRS on behalf of NSO and which Defendant signed, and in which Defendant claimed that NSO donated notes receivable with a value of $6 million to CMS's Scholarship Fund. Defendant intentionally failed to disclose to the IRS certain material facts concerning this transaction, including the fact that the donation of the promissory notes was conditioned on the School's agreement to sell the promissory notes for $1 million, as part of a series of transactions that resulted in the transfer of the $6 million to two NSO trustees, namely, Defendant and Individual E.

### Other Transaction

While on the CMS Board, Defendant also solicited other personal financial gain in connection with other CMS assets, including CMS's real property at 2020 W. Ogden Ave., Chicago ("2020 Property"). In that regard, in or about 2000, Defendant solicited a sale transaction for the real property at 2020 Property which would provide a kickback of money to Defendant. The amount of the kickback was never finalized and the proposed sales transaction never occurred. As a member of the CMS Board, Defendant intentionally concealed from and failed to disclose to CMS material facts relating to the proposed sale transaction, including,

specifically, his solicitation of personal financial gain in connection with the proposed transaction.

In furtherance of this scheme, on or about December 12, 2001, at Deerfield, in the Northern District of Illinois, Eastern Division, Defendant, for the purpose of executing the above-described scheme, and attempting to execute the above-described scheme, did knowingly cause to be placed in an authorized depository for mail matter, to be sent and delivered by the United States Postal Service, according to the directions thereon, an envelope containing a check in the amount of approximately $28,000, from Kiferbaum Construction Company, payable to Glennon's consulting company, NACO, which envelope was addressed to the company's address in Chicago, Illinois; in violation of Title 18, United States Code, Sections 1341, 1346, and 2.

8.    For purposes of calculating the Sentencing Guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties stipulate and agree on the following points:

a.    The Sentencing Guidelines effective on November 1, 2005 apply.

b.    <u>Count One -- Mail Fraud</u>

i.    The applicable Guidelines Section is § 2C1.1.

ii.    Pursuant to Guideline § 2C1.1(a)(1), the base offense level is 14 because defendant was a public official;

42

iii. Pursuant to Guideline § 2C1.1(b)(1), the offense level is increased 2 levels because the offense involved more than one bribe or extortion;

iv. Pursuant to Guideline §§ 2C1.1(b)(2) and 2B1.1(b)(1)(L), the offense level is increased by 20 levels because the intended loss was more than $7 million and less than $20 million.

v. Pursuant to Guideline § 2C1.1(b)(3), the offense level is increased 4 levels because the offense involved a public official in a high-level decision-making and sensitive position;

vi. Pursuant to Guideline § 3B1.1(a), the offense level is increased by 4 levels because defendant was an organizer and leader of criminal activity that involved five or more participants;

vii. Based on the above, the adjusted offense level for Count One is 44.

    c.   <u>Count Twenty-Three -- Money Laundering</u>

i. The applicable Guidelines Section is § 2S1.1.

ii. Pursuant to Guideline § 2S1.1(a)(1), the base offense level is determined by the underlying offense from which the laundered funds were derived, which is 40.

iii. Pursuant to Guideline § 2S1.1(b)(2)(B), the offense level is increased by 2 levels because defendant was convicted under 18 U.S.C. § 1956;

iv. Pursuant to Guideline § 3B1.1(c), the offense level is increased 2 levels because defendant was an organizer and leader in criminal activity that involved fewer than five participants;

v. Based on the above, the adjusted offense level for Count Twenty-Three is 44.

d. Stipulated Offense in Paragraph 7

i. The applicable Guidelines Section is § 2B1.1.

ii. Pursuant to Guideline § 2B1.1(a)(1), the base offense level is 7 because the offense is referenced in Guideline § 2B1.1 and has a statutory maximum term of imprisonment of 20 years or more;

iii. Pursuant to Guideline § 2B1.1(b)(1)(K), the offense level is increased by 20 levels because the intended loss was more than $7 million and less than $20,000,000;

iv. Pursuant to Guideline § 2B1.1(b)(8), the offense level is increased by 2 levels because the offense involved a misrepresentation that defendant was acting on behalf of charitable and educational organizations;

v. Pursuant to Guideline § 2B1.1(b)(9), the offense level is increased by 2 levels because the offense involved sophisticated means;

vi. Pursuant to Guideline § 3B1.1(a), the offense level is increased by 4 levels because defendant was an organizer

44

and leader of criminal activity that involved five or more participants;

vii. Pursuant to Guideline § 3B1.3, the offense level is increased by 2 levels because defendant abused a position of private trust in a manner that significantly facilitated the commission and concealment of the offense;

viii. Based on the above, the adjusted offense level for the Stipulated Offense is 37.

e. Grouping – Multiple Counts:

i. Pursuant to Guideline § 3D1.2(c), Counts One and Twenty-Three are grouped together in a single group for sentencing purposes because the mail fraud scheme (Count One) embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to the money laundering count (Count Twenty-Three). Pursuant to Guideline § 3D1.3(a), the offense level applicable to this group is 44;

ii. Pursuant to Guideline § 3D1.2(d), the Stipulated Offense is grouped with Counts One and Twenty-Three in a single group for sentencing purposes because the offense level is determined largely on the basis of the total amount of harm or loss;

iii. Pursuant to Guideline § 3D1.3(b), the offense level for the group of the Stipulated Offense, Count One, and Count Twenty-Three is determined under Guideline § 2C1.1 because the

counts involve offenses of the same general type and Guideline §
2C1.1 produces the highest offense level. As the aggregated
quantity involves more than $20 million and less than $50 million
of intended loss, the adjusted offense level is 46.

    f.   The parties agree that Defendant has clearly
demonstrated a recognition and affirmative acceptance of personal
responsibility for his criminal conduct. If the government does
not receive additional evidence in conflict with thi s provision,
and if Defendant continues to accept responsibility for his
actions, within the meaning of Guideline § 3E1.1, a 2-level
reduction in the offense level is appropriate.

    g.   The parties agree that Defendant has provided
truthful information and timely notice of his intention to enter a
plea of guilty, within the meaning of Guideline § 3E1.1(b), so that
an additional 1-level reduction in the offense level is
appropriate, if the offense level is 16 or greater, and the Court
finds that a reduction under Guideline § 3E1.1(a) is appropriate.

    h.   Based on the facts known to the government,
Defendant's criminal history points equal 0, and Defendant's
criminal history category is I.

    i.   Based on the above calculations, which are
preliminary in nature, and assuming that defendant's criminal
history category is I, the preliminary projected applicable offense
level is a level 43, so that the preliminary projected applicable
sentencing range is a life term of imprisonment.

j. Defendant and his attorneys and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this plea agreement. Defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Sentencing Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations.

9. Errors in calculations or interpretation of any of the guidelines may be corrected by either party prior to sentencing. The parties may correct these errors or misinterpretations either by stipulation or by a statement to the probation office and/or Court setting forth the disagreement as to the correct guidelines and their application. The validity of this Agreement will not be affected by such corrections, and Defendant shall not have a right to withdraw his plea on the basis of such corrections.

10. Defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

11. Defendant understands: (a) Count One, to which he will plead guilty, carries a maximum penalty of 20 years' imprisonment;

a maximum fine of $250,000, or twice the gross gain or twice the gross loss, whichever is greater; and a term of supervised release of at least two but not more than three years, as well as any restitution ordered by the Court; and (b) Count Twenty-Three, to which he will also plead guilty, carries a maximum penalty of 20 years' imprisonment, a maximum fine of $500,000, or twice the property involved with the transaction, whichever is greater, a term of supervised release of at least two but not more than three years which the Court may specify, as well as any restitution the Court may order. Defendant understands that the terms of imprisonment and supervised release on each count could be imposed consecutively and that the fines imposed on each count could be cumulative.

12. Defendant understands that in accord with federal law, Title 18, United States Code, Section 3013, upon entry of judgment of conviction, Defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty imposed. Defendant agrees to pay the special assessment of $200 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

13. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a. If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by

the judge sitting without a jury. Defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, Defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

b.     If the trial is a jury trial, the jury would be composed of twelve layperson selected at random. Defendant and his attorneys would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt, and that it was to consider each count of the indictment separately.

c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

d.     At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorneys would be able to

cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

    e.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

14.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorneys have explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial.

15.    Defendant is also aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed. Acknowledging this, Defendant knowingly waives the right to appeal any sentence within the maximum provided in the statutes of conviction (or the manner in which that sentence was determined), in exchange for the concessions made by the United States in this Plea Agreement. Defendant also waives his right to challenge his sentence or the manner in which it was determined in any collateral attack, including but not limited to a motion brought under Title 28, United States Code, Section 2255. The waiver in this paragraph does not apply to a claim of

involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation.

16. Defendant understands that the Superseding Indictment and this Plea Agreement are matters of public record and may be disclosed to anyone.

17. Defendant agrees he will fully and truthfully cooperate with the government in any matter in which he is called upon to cooperate by representatives of the United States Attorney's Office for the Northern District of Illinois, including the following:

a. Defendant agrees to provide complete and truthful information in any investigation and pre-trial preparation, and complete and truthful testimony, if called upon to testify, before any grand jury and court proceeding, and any related civil, administrative, or court proceeding.

b. The parties agree that they will jointly recommend that defendant's sentencing be postponed until after the conclusion of any ongoing investigation in which Defendant is cooperating, and the conclusion of any prosecution arising from that investigation.

18. Nothing in this Agreement shall limit the Internal Revenue Service (IRS) in its collection of any taxes, interest or penalties from defendant. If requested to do so by the IRS, Defendant agrees to transmit his original records, or copies thereof, and any additional books and records which may be helpful, for any years requested by the IRS, to the Examination Division of the IRS so that the IRS can conduct a civil audit of defendant.

51

19.   Defendant understands that pursuant to Title 12, United States Code, Section 1829, his conviction in this case will prohibit him from directly or indirectly participating in the affairs of any financial institution insured by the Federal Deposit Insurance Corporation (FDIC) except with the prior written consent of the FDIC and, during the ten years following his conviction, the additional approval of this Court. Defendant further understands that if he violates this prohibition, he may be punished by imprisonment for up to five years and a fine of up to $1,000,000.

20.   Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him in this case, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

21.   The government and defendant agree that at the time defendant began to cooperate with the government, defendant's guidelines calculation would have been determined pursuant to the Sentencing Guidelines effective on November 5, 2003, but that, due to a change in the applicable law, defendant's guidelines calculation must now be determined pursuant to the Sentencing Guidelines in effect on the day that defendant will be sentenced. In order to reflect the parties' mutual expectations at the time defendant began his cooperation with the government, and in light of the fact that defendant's cooperation required delaying his

guilty plea and sentencing, the government and defendant agree that if the government makes a motion for departure pursuant to Guideline § 5K1.1, the government will use the Sentencing Guidelines in effect on November 5, 2003 as the starting point for determining the extent of the downward departure that the parties will propose to the Court in this case.

22. At the time of sentencing, the government shall make known to the sentencing judge the extent of defendant's cooperation, and, if Defendant continues to provide full and truthful cooperation, shall move the Court, pursuant to Sentencing Guideline § 5K1.1, to depart downward from the applicable sentencing guidelines range, and pursuant to Rule 11(c)(1)(C), to impose an agreed sentence of imprisonment of 67 months incarceration. Other than the agreed term of incarceration, the Court remains free to impose any sentence the Court deems appropriate. However, under Rule 11(c)(1)(C), the plea will be null and void if the Court refuses to impose the 67 month sentence of incarceration to which the parties have agreed.

23. a. Regarding restitution as to the offenses of conviction, defendant understands that pursuant to Title 18, United States Code, Section 3663A, the Court must order defendant to make restitution in any case in which the Court determines that there is a property loss to the victim of the offense of conviction, minus any credit for funds repaid prior to sentencing.

b.   Regarding restitution as to the aspects of the stipulated offense relating to the Scholl Property, Defendant further voluntarily agrees to pay restitution in an amount up to $1.5 million, minus any credit for funds repaid prior to sentencing by any party, to Rosalind Franklin University of Medicine and Science, formerly known as Finch University of Health Sciences/the Chicago Medical School, pursuant to Title 18, United States Code, Sections 3663A(a)(3) and 3664.

c.   Defendant further understands that while forfeiture of property is not typically treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose, it is agreed by the parties that any payments made in satisfaction of the civil forfeiture judgment discussed in paragraph 24 below shall be credited to any outstanding restitution judgment.

d.   Defendant understands that Title 18, United States Code, Section 3664 and Sections 5E1.1 and 5E1.2 of the Sentencing Guidelines set forth the factors to be weighed in setting a fine and in determining the schedule, if any, according to which restitution is to be paid in this case.   Defendant agrees to provide full and truthful information to the Court and United States Probation Officer regarding all details of his economic circumstances, and to provide such information to the United States Attorney's office.   Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title

54

18, United States Code, Section 1001, or as a contempt of the Court, and would constitute a breach of this Plea Agreement.

24. Defendant further acknowledges that the government will file a civil complaint against certain property, namely $5 million, alleging that the property is subject to forfeiture. Defendant relinquishes all right, title, and interest he may have in this property that is used to satisfy the amount due and further agrees to the entry of a judgment against him, extinguishing any interest or claim he may have had in the property subject to forfeiture. Defendant further agrees to cooperate fully and truthfully in identifying and forfeiting tainted assets subject to forfeiture, regardless of where they may have been transferred or hidden. Any attempt on the part of defendant to conceal property prior to the satisfaction of this judgment shall be deemed to violate this plea agreement. Defendant agrees that no transfers of property available to satisfy this judgment can be effectuated by Defendant or his agents without concurrence of the government or approval of the Court. To the extent that Defendant owns any property available to satisfy this judgment jointly, he agrees that any efforts to sell, to transfer, or otherwise convey his interest shall be subject to the same conditions. Further, defendant agrees maintain all financial obligations relating to any property so as to preserve and protect the availability of the property to satisfy the forfeiture judgment.

25.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Plea Agreement.    He further understands that in the event he violates this Plea Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute Defendant not subject to any of the limits set forth in this Plea Agreement, or to resentence Defendant.  Defendant understands and agrees that in the event that Defendant's plea is subsequently withdrawn, vacated or breached by Defendant, and the Government elects to void the Plea Agreement and prosecute Defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Plea Agreement may be commenced against Defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of such prosecutions.

26.    Defendant and the government agree that after Defendant has entered a plea of guilty in this case, the government will move to dismiss the indictment and superseding indictment without prejudice against Defendant in United States v. Stuart Levine, 05 CR 408-1 (Grady, J.).  Defendant understands and agrees that in the event that Defendant's Plea is subsequently withdrawn, vacated or breached by Defendant, and the Government elects to void the Plea Agreement and prosecute Defendant, the government may bring charges

against Defendant based on any of the allegations in the superseding indictment in <u>United States v. Stuart Levine</u>, 05 CR 408 (Grady, J.) that are not time-barred by the applicable statute of limitations on the date of the signing of this Plea Agreement in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Plea Agreement and the commencement of such prosecutions.

27. After sentence has been imposed on the counts to which Defendant pleads guilty as agreed herein, the government will move to dismiss the original indictment and the remaining counts of the Superseding Indictment in this case as to Defendant.

28. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement, to cause Defendant to plead guilty.

29. Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

57

30.     Defendant acknowledges that he has read this Plea
Agreement and carefully reviewed each provision with his attorney.
Defendant further acknowledges that he understands and voluntarily
accepts each and every term and condition of this Agreement.

AGREED THIS DATE:    _October 27, 2006_

_____
PATRICK J. FITZGERALD
UNITED STATES ATTORNEY

_____
STUART LEVINE
Defendant

_____
CHRISTOPHER S. NIEWOEHNER
Assistant United States Attorney

_____
JEFFREY STEINBACK
Attorney for Defendant

_____
KAARINA SALOVAARA
Assistant United States Attorney